**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DISTRICT OF COLUMBIA,** | : | |
| **Plaintiff,** | : | **Case No.: 1:24-cv-02068 (JEB)** |
| **v.** | : | |
| **ALL OF THE PARCEL OF LAND** | : | |
| **IDENTIFIED AS SQUARE 5246, LOT** | | |
| **110, LOCATED IN THE 5700 BLOCK** | : | |
| **OF EAST CAPITOL STREET, NE** | | |
| **IN THE DISTRICT OF COLUMBIA,** *et al.*, | : | |
| **Defendants.** | : | |

**THE DISTRICT OF COLUMBIA'S MOTION TO CONFIRM THE VALIDITY OF THE
TAKING AND OPPOSITION TO DEFENDANT CG MARKETPLACE, LLC'S MOTION
TO DISMISS**

Plaintiff the District of Columbia (the "District") respectfully moves this Court to

confirm the validity of the taking of the subject real property and deny defendant CG

Marketplace, LLC's ("CGM") motion to dismiss.  The Court should confirm the validity of the

taking and deny CGM's motion to dismiss because (1) the District had a valid public purpose and

strictly complied with District of Columbia eminent domain statutes when it took the Property,

(2) Defendants have asserted no legally sufficient defenses or objections to the taking, and (3)

the District took the real property subject to whatever real property interest this Court may find

the United States Department of Housing and Urban Development holds, if any.

## Background

The subject real property (the "Property") is approximately 12 undeveloped acres located

east of the Anacostia River in a community that is severely underserved by grocery stores and

other retail options.  Prior to the taking, the Property was owned by Defendant District of

Columbia Housing Authority[1] ("DCHA") and was leased to CG Marketplace, LLC ("CGM"). CGM is a single purpose entity comprised of an affiliate of DCHA and A&R/THC Marketplace, LLC. A&R Development Corp., a Baltimore developer, controlled CGM and was responsible for all facets of the development. CGM was to develop the Property by building affordable housing, retail, and a restaurant. To further this development, DCHA and CGM entered a 99-year, $1 per year ground lease for the Property.

Underserved neighborhoods in the District have long been plagued by food insecurity and a shortage of quality retail. To combat this problem, the District actively recruited Walmart to open stores in these underserved neighborhoods. *See* O'Connell, Jonathan, "Walmart Agrees to Fund Training Centers", Wash. Post., Nov. 11, 2011.[2] As part of its expansion into the District, Walmart agreed to build a store on the Property and signed a 15-year, $1,300,000 per-year sublease with CGM. Unfortunately, in January 2016 Walmart reversed course and decided not to build its store on the Property. However, while Walmart did not open a store on the Property, it continued making annual rent payments of $1,300,000 to CGM.

CGM, through Theo Rodgers (the managing partner of A&R Development), attempted to persuade Walmart to reconsider its decision. Unable to convince Walmart to build a store, CGM gave up and "mothballed" the project, and prepared the site for "long term inactivity". *See* Letter, attached as **Exhibit 1**. CGM was apparently content to collect the annual $1,300,000 payment from Walmart while failing to build the affordable housing and grocery store it

---

[1] DCHA is a legally independent authority. *See* D.C. Code Section 6-202.
[2] https://www.washingtonpost.com/blogs/capital-business/post/wal-mart-agrees-to-fund-job-training-programs-open-hiring-centers-in-deal-with-district-officials/2011/11/22/gIQAmuzUlN_blog.html. Last accessed May 8, 2025.

promised to the community.  CGM's decision was undoubtedly made easier given that it was paying only $1 per year to lease the entire site.

CGM's decision to abandon its commitment left the residents of the East Capitol Street corridor community in an intolerable position.  Determined to protect some of its most vulnerable residents, the District took an assignment of the Walmart sublease and sought to bring a replacement grocery store to the site.  *See* Weil, Juli Zausamer, "Bowser aiming to take over Walmart lot, bringing needed grocery store to Ward 7", Wash. Post, January 27, 2022.[3]

In addition, to address the problems created by the Property the Council of the District of Columbia (the "Council") passed the East Capitol Gateway Eminent Domain Authority Act of 2022, D.C. Law 24-0155wherein the Council found:

> "(1)The communities east of the Anacostia River, including the areas along the East Capitol Street corridor, are underserved by retail options, particularly access to healthy food options.
>
> (2) The collection of parcels known as East Capitol Gateway provides an ongoing opportunity to provide much needed commercial and retail activity to an underserved community.
>
> (3) The parcels are controlled by CG Marketplace LLC, which is owned in equal shares by a subsidiary of the District of Columbia Housing Authority and A&R/THC Marketplace, LLC, a private developer ( "Joint Venture"). The Joint Venture has made no effort to continue to develop the parcels and has explicitly stated the parcels were being converted to "long-term inactivity".
>
> (4) Due to the length of the existing ground lease, these parcels could remain undeveloped for a generation, exacerbating the inequitable lack of retail options for residents of this part of the District of Columbia, specifically Ward 7.
>
> (5) The parcels, once developed, will further many important public purposes, including the removal of unsafe and unsanitary conditions, reduction of the incidence of crime, and the removal of garbage and other eyesores.

---

[3] https://www.washingtonpost.com/dc-md-va/2022/01/27/dc-walmart-grocery-stores/.  Last accessed May 8, 2025.

(6) The parcels, once developed, will expand economic opportunities for residents of Ward 7 and their neighbors in Wards 5, 6, and 8, including much needed job opportunities.

(7) The development of the parcels will further aid in reducing food insecurity in an underserved neighborhood and provide revitalization in an economically distressed community.

(8) It is highly unlikely that the parcels will be developed absent the involvement of the District government and without the Mayor's authority to exercise eminent domain."

D.C. Law 24-0155, § 2. [4]

As required by D.C. Code § 16-1311, the District first unsuccessfully attempted to purchase the Property at a satisfactory price, and then filed this eminent domain action in D.C. Superior Court pursuant to D.C. Code § 16-1311 and D.C. Law 24-0155. *See* Complaint at ¶ 5. In filing this action, the District strictly complied with the requirements of D.C. Code § 16-1311, *et seq.* and D.C. Super. Ct. Civ. R. 71.1, which governs the procedure for the condemnation of property. The District filed a Complaint in Condemnation and a Declaration of Taking and delivered a Notice to the clerk of the court. The District's Declaration included:

(1) a statement of the authority under which and the public use for which the property is taken;
(2) a description of the property taken sufficient for the identification thereof;
(3) a statement of the estate or interest in the property taken for public use
(4) a plan showing the property taken; and
(5) a statement of the sum of money estimated by the Mayor to be just compensation for the property taken, which sum was contemporaneously deposited into the Superior Court registry.

*See* Declaration of Taking, attached as **Exhibit 2**.

---

[4] The permanent East Capitol Gateway Eminent Domain Authority Act of 2022, D.C. Law 24-0155, was preceded by an emergency act, D.C. Act 14-0336, a temporary act, D.C. Law 24-0125, and congressional review emergency act, D.C. Act 14-0411.

Title to the property vested in the District on June 16, 2022, upon the filing of the declaration of taking and the deposit of estimated just compensation into the registry of the Court, pursuant to D.C. Code § 16-1314(b).

In response to the District's Complaint in Condemnation, CGM filed an Answer and an Amended Answer and Crossclaim.  Importantly, CGM has conceded that it has not pled any defenses or objections to the taking in either its Answer or Amended Answer.  *See* CGM's Opp. to the District's Motion to Strike at p. 1 ("[CGM] asserts *no* affirmative defenses in its Answer, let alone any other "defense" or "objection" to the taking"), attached here as **Exhibit 3**.  As a result, CGM has waived all defenses or objections to the taking as a matter of law.

Further, Defendants DCHA, PNC Bank, NA, Brian J. Cannon, and Patrick J. Tehan filed notices of appearance pursuant to Super. Ct. Civ. R. 71.1(e)(1).  By filing these notices of appearance pursuant to this rule, these defendants indicated that they have no defenses and objections to the taking and do not contest the validity of the taking, but retain their right to claim and present evidence on the amount of just compensation at trial pursuant to Fed. R. Civ. P. 71.1(e)(3).

After the conclusion of discovery, CGM moved the Superior Court to dismiss the action, arguing that the United States held an interest in the Property and was therefore a necessary party.  The District opposed this motion because the United States does not hold a real property interest in the Property and it has at most an *undisturbed* contractual relationship with DCHA.  As a result, the District could not and did not take any interest from the United States.  The Superior Court did not dismiss the action but instead ordered the District to add the United States to this action.  The District filed an amended complaint and declaration of taking and the United States subsequently removed the case to this Court.

The United States has filed three answers to the District's amended complaint in condemnation. In its second amended answer the United States concedes that it does not have a real property interest in the Property. Rather, it asserts that it has a contractual relationship with DCHA and asks the Court to retroactively revitalize a purportedly improperly released deed of trust that it never recorded with the District of Columbia Recorder of Deeds and has not yet produced in this case.

## Standard of Review

It is well established that the District may take property to protect public safety and public health. *Berman v. Parker*, 348 U.S. 26, 32 (1954) ("Public safety, public health, morality, peace and quiet, law and order -- these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it."). Eliminating food insecurity is a public health, safety and welfare matter. *See 2A Nichols on Eminent Domain § 7.06, (35)* ("Private property may be taken by eminent domain for the establishment of a public market. Such a use is public in character, even though stalls or other sections are leased to private individuals.")

Further, it is well settled that a taking is lawful when accomplished under the declaration of taking statute in force in the District of Columbia, and in accordance with legislative authority. *U.S. v. Parcel of Land with Improvements Thereon in Square South of 12, District of Columbia*, 100 F.Supp. 498, 504 (D.D.C. 1951). Therefore, the validity of the taking of the Property hinges on whether the District complied with the applicable eminent domain statutes, D.C. Code § 16-1311, *et seq*. and D.C. Act 24-411.

## Argument

This Court should confirm the validity of the taking and deny CGM's motion to dismiss because (1) the District had a valid public purpose and strictly complied with District of

Columbia eminent domain law when it took the Property, (2) Defendants have failed to raise any legally sufficient defenses or objections to the taking, and (3) any interest held by the United States is unaffected by the District's taking.

**I.    The District took the Property for the valid public purpose of protecting public health, safety, and welfare.**

The Supreme Court has long given great deference to legislative judgment in deciding whether a taking satisfies the public use requirement of the Fifth Amendment. *Kelo v. City of New London, Conn.*, 545 U.S. 469, 483 (2005) (stating that "[w]ithout exception, our cases have defined [the concept of public purpose] broadly, reflecting our longstanding policy of deference to legislative judgments in this field"); *Franco v. National Capital Revitalization Corporation*, 930 A.2d 160, 175 (D.C. 2007). "The role of the judiciary in determining whether th[e] power [of eminent domain] is being exercised for a public purpose is an extremely narrow one." *Franco*, 930 A.2d at 175 (D.C. 2007) (citing *Berman v. Parker*, 348 U.S. 26, 32 (1954) and *Midkiff*, 467 U.S. at 240, and noting that "Kelo did not repudiate those statements").

It cannot be disputed that removing slum and blight to bring about economic development are legitimate public purposes that can support the exercise of eminent domain. *Kelo v. City of New London, Conn*., 545 U.S. 469, 484-85 (2005); *Berman v. Parker*, 348 U.S. 26, 33 (1954); *Franco*, 930 A.2d at 168. The District of Columbia Court of Appeals confirmed that rational basis review is the appropriate analysis, quoting *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 242 (1984), to the effect that "the constitutional requirement is satisfied if the state Legislature rationally could have believed that the Act would promote its objective." *Id*. at 173, n. 13. This Court should accept the stated public purpose for the condemnation offered by the legislature unless it concludes that it is "palpably without reasonable foundation." *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 241 (1984).

As discussed above, the Property is in a community that lacks adequate retail options and suffers from food insecurity. The Council passed the East Capitol Gateway Eminent Domain Authority Act to address these problems. The Council determined that the Property was in a neighborhood plagued by food insecurity and that the Property contributed to unsafe and unsanitary conditions. Further, because CGM had prepared the site for "long term inactivity", it was likely these conditions would remain for a generation.

The District took the Property pursuant to the Act, which clearly enumerates constitutionally valid public purposes for the taking, and complied with the statutory requirements of the District's eminent domain statute D.C. Code § 16-1311. Accordingly, this Court should confirm the validity of the taking and that title to the Property vested in the District on June 16, 2022.

## II.    The District strictly complied with the applicable eminent domain statutes.

The East Capitol Gateway Eminent Domain Authority Act authorized the Mayor to acquire the Property by eminent domain pursuant to D.C. Code § 16-1311, *et seq*. D.C. Code § 16-1311 authorizes the Mayor to acquire real property by eminent domain when it cannot be purchased at a price satisfactory to the officers of the District. D.C. Code § 16-1314 states that "upon the filing of the declaration of taking and the deposit in the registry of the court . . . title to the property . . . shall vest in the District of Columbia . . ."

The District attempted to purchase the Property at a price satisfactory to the officers of the District but was unable to do so. *See* Complaint at ¶ 5. The District filed a Declaration of Taking and deposited estimated just compensation in the court registry in compliance with D.C. Code § 16-1314. The District's taking was lawful because it was accomplished under the declaration of taking statute in force in the District of Columbia (D.C. Code § 16-1314), and in

accordance with legislative authority.  *See U.S. v. Parcel of Land with Improvements Thereon in Square South of 12, District of Columbia*, 100 F.Supp. 498, 504 (D.D.C. 1951).

III.    **Defendants have waived all defenses and objections to the taking.**

The only procedurally permitted way to dispute the validity of a taking is by pleading defenses and objections in an answer.  "A defendant that has an objection or defense to the taking ***must*** serve an answer [that] ***must*** . . . state all the defendant's objections and defenses to the taking."  Fed. R. Civ. P. 71.1(e)(2) (emphasis added).  The consequence of failing to do so is that "[a] defendant waives all objections and defenses not stated in its answer."  Fed. R. Civ. P 71.1(e)(3).  Moreover, "[n]o other pleading or motion asserting an additional objection or defense is allowed."  *Id*.  No defendant in this case has raised a legally sufficient defense or objection to the taking in an answer and therefore all defendants have waived all defenses or objections as a matter of law.  *Id*.  Because no defendant disputes the District took the property for valid public purposes in compliance with its statutory authority, and because the District has not taken any interest from the United States, title to the Property therefore vested in the District in fee simple absolute pursuant to D.C. Code § 16-1314.

A.    **CGM has emphatically stated that it asserted no defense or objection to the taking and thereby waived any defenses and objections to the taking.**

Because CGM filed an answer in this case, the District inferred under the above rules that CGM intended to assert defenses and objections to the taking and moved to strike CGM's defenses and objections.  *See* District's Motion to Strike, filed on August 1, 2022.  However, in Opposition to the District's motion, filed on August 15, 2022, CGM stated:

"But [Defendant] asserts ***no*** affirmative defenses in its Answer, let alone any other "defense" or "objection" to the taking.  Opp. to the District's Motion to Strike at p. 1.

"But the denials in Paragraphs 3 and 4 relate to insufficient knowledge and legal conclusions. **Hardly a defense or objection, let alone an affirmative defense**. And the denial in Paragraph 5 concerns the District's failure to negotiate with [Defendant] before filing this action. **Again, neither a defense, objection, nor affirmative defense**. *Id.* (Emphasis added).

Because CGM has so emphatically denied asserting any objections and defenses to the taking in its answer, by operation of Fed. R. Civ. P. 71.1(e)(3), CGM has waived all objections and defenses to the taking. By doing so CGM concedes the validity of the subject taking and disputes only the amount and distribution of just compensation.

### B. Defendants DCHA, PNC Bank, Cannon, and Tehan waived all defenses and objections to the taking by filing a notice of appearance pursuant to Fed. R. Civ. P. 71.1(e)(3).

Defendants DCHA, PNC Bank, Cannon, and Tehan filed notices of appearance pursuant to Super. Ct. Civ. R. 71.1(e)(1), which provides in pertinent part "(a) defendant that has no objection or defense to the taking of its property may serve a notice of appearance designating the property in which it claims an interest." And as noted above, Fed. R. Civ. P. 71.1(e)(3) provides that a defendant waives all defenses or objections to the taking not stated in an answer. Because Defendants DCHA, PNC Bank, Cannon, and Tehan filed notices of appearance in the case in lieu of answers, these defendants noted that they have no objection or defense to the taking of its property, and further have waived all defenses or objections. By doing so Defendants DCHA, PNC Bank, Cannon, and Tehan concede the validity of the subject taking and dispute only the amount of just compensation.

### C. The United States' interests are unaffected by the District's taking.

In its second amended answer, the United States asserts two possible "interests" in this proceeding. *See* United States' Second Amended Answer, pp. 4-8. First, the United States alleges that it previously held a real property interest through the Declaration of Trust that was recorded against the Property. *Id.* at para. 12. (The Declaration of Trust is a "legal instrument

that grants [the United States] an interest in public housing property.")  However, as the United

States concedes, that Declaration of Trust was released in 2012, thus extinguishing the United

States' real property interest.  *Id.* at para. 20.

Generally, "[e]ach claimant bears the burden of establishing his or her right to the

property in question." *One Parcel of Land in Prince George's Cnty.*, 197 F. Supp. 2d at 342

(citing *United States v. Lee*, 360 F.2d 449, 452 (5th Cir. 1966) and *United States v. Certain Land

in the Village of Highgate Springs*, 413 F.2d 128, 128 (2d Cir. 1969)).  The United States has

asked the Court to restore the Declaration of Trust but has not yet been found to have met the

burden of establishing any real property interest in the Property.

Second, the United States alleges that it entered into contractual agreements with DCHA

known as the "Annual Contributions Contract" (the "ACC") and the HOPE VI grant.  These

contracts govern DCHA's use of federal funds for the development of affordable housing.

Importantly, neither contract grants the United States a real property interest in the Property.

Documents conveying an interest in real property must be recorded with the District of Columbia

Recorder of Deeds to be effective against interested parties. D.C. Code § 42-401. A review of the

land records of the District of Columbia for the Property confirms that neither the ACC nor

HOPE VI grant have been recorded, which is consistent with the notion that these documents do

not convey a real property interest.

The District took the fee simple interest in the real property by filing the Declaration

pursuant to D.C. Code § 16-1314.  *See* Declaration of Taking, attached hereto as **Exhibit 3**.  The

District could not and did not take any of the United States' contractual interests because the

ACC and HOPE VI contracts did not grant the United States a real property interest in the

Property.  In fact, the United States asserts that these contractual rights are still in full effect and

that it is entitled to any disposition proceeds awarded to DCHA. *See* Second Amended Answer at pp. 12 – 16.

The United States' second amended answer does not identify any real property interest taken by the District. Any other interest, contractual or otherwise, held by the United States remains undisturbed by the District's taking and the Court should therefore confirm the validity of the taking.

**VI.    Dismissal is not warranted because the District cannot and has not taken any interest from the United States.**

CGM has moved the Court to dismiss this action, alleging that the United States is a necessary party that cannot be joined because it cannot waive sovereign immunity. However, the Court should deny CGM's motion because any interest held by the United States remains undisturbed by the District's taking no matter what that interest may be.

It is black letter law that the District cannot take from the United States, unless the United States waives its sovereign immunity. *See Utah Power & L. Co. v. United States*, 230 F. 328, 338 (8th Cir., 1915). Eminent domain proceedings are *in rem* proceedings, involving the taking of the property itself. *See A.W. Duckett & Co. v. United States, 266 U.S. 149, 151 (1924)*. They are not actions against the party defendants. In this *in rem* action, because of the United States' sovereign immunity and federal supremacy, the District took the Property subject to any interest held by the United States. As a result, whatever the United States' interests in the Property, if any, such interests remain undisturbed by the District's taking.

In fact, CGM does not allege that the District has taken an interest from the United States. In its motion, CGM argues that the United States does not have a real property interest in the Property. ("HUD does not have either a mortgage or lien on the Property", motion at p. 9) and

concedes that the United States' interest is a contract with DCHA that entitles it to DCHA's disposition proceeds. *Id.* at p. 7.

The purpose of eminent domain procedure, as set forth in Fed. R. Civ. P. 71.1, is to ensure that every party with a compensable interest receives notice of the action and can put forth a claim for just compensation. *See Swanson v. United States,* 156 F.2d 442, 445 (9th Cir. 1946)*.* The District has not taken *any* interest from the United States and any interest held by the United States remains undisturbed. Because the United States retains its interest in the property, this undisturbed interest cannot and should not be the basis for dismissal, and CGM's motion to dismiss should be denied.

## VII.    CGM lacks standing to assert the United States' sovereign immunity.

CGM lacks standing to argue that the United States has sovereign immunity from this suit and cannot move for dismissal on this basis. A litigant normally "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499 (1975). Only the United States may assert its sovereign immunity from this action.

This principle is demonstrated in the cases cited by CGM. In *City of Sacramento v. Secretary of Housing and Urban Development,* 363 F. Supp. 736 (E.D. Cal. 19720) the taken real property was held in the name of the Secretary of Housing and Urban Development. HUD was named as a defendant in the action and immediately moved to dismiss the action. The court granted HUD's motion to dismiss. Conversely, in *Town of Davis*, the United States was not named as a defendant. The court found the Department of Commerce had a property interest (because a Deed Notation was recorded in the land records against the property) and ordered the joinder of the United States Department of Commerce to the action. Notably, the court did not

dismiss the proceeding. *Town of Davis*, 647 F. Supp. 2d at 630. CGM lacks standing to assert that the United States has sovereign immunity and its motion to dismiss should be denied.

<u>**Conclusion**</u>

The Property is in a neighborhood that suffers from food insecurity and a lack of retail options. CGM controlled the Property through a 99-year lease and instead of building the retail and affordable housing it promised to the community, it allowed the property to lie fallow. The District took the Property by eminent domain to more expeditiously provide food, retail options and affordable housing to some of its most vulnerable residents.

This Court should confirm the validity of the taking and deny CGM's motion to dismiss because (1) the District took the Property pursuant to D.C. Code § 16-1311 and D.C. Act 24-411 for the valid public purposes of reducing food insecurity and eliminating slum and blight, (2) Defendants have not raised, and have therefore waived as a matter of law, any defenses or objections to the taking, thereby conceding the validity of the taking, and (3) any interest held by the United States is unaffected by the District's taking.

May 9, 2025                          Respectfully submitted,

                                     BRIAN L. SCHWALB
                                     Attorney General for the District of Columbia

                                     DAVID FISHER
                                     Deputy Attorney General,
                                     Commercial Division

                                     __/s/_____
                                     WILLIAM D. BURK, D.C. Bar # 464349
                                     Chief, Land Acquisition and Bankruptcy Section

/s/
ANDREW A. GLOVER, D.C. Bar #980735
Assistant Attorney General, District of Columbia
400 6th St., NW, Suite 9100
Washington, D.C.  20001
202-442-9830
andrew.glover@dc.gov
Counsel for the District of Columbia

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the District's Motion and Opposition was sent on this 9th day of May, 2025 to all parties of record.

/s/

Andrew A. Glover

**Exhibit 1**



## A&R DEVELOPMENT

**VIA EMAIL & FEDERAL EXPRESS**

September 19, 2016

Ms. Adrianne Todman
Executive Director
District of Columbia Housing Authority
1133 North Capitol Street NE
Washington, DC 20002

           Re:    **Capitol Gateway Marketplace Status**

Dear Adrianne:

Given our ongoing partnership in Capitol Gateway Marketplace, I'm writing to provide you with an update on the commercial and residential portions of the project and our intended next steps.

**Commercial Site**

Since receiving notice of Walmart's decision not to build a store at the site, a significant portion of our efforts have been directed at confirming and validating the Walmart lease. Based on its site work reimbursement to the joint venture of $5.4 million and other actions taken, Walmart has expressed its intention to commence the twenty-year lease payments in July of 2017. Walmart is in full control of their tract and are undertaking leasing efforts for the site. Additionally, Walmart has been maintaining the site, and we have approached them with a plan to stabilize their tract for the long-term. This work includes grading against existing sheeting and shoring as well as installing a permanent security fence around their pad perimeter. To date, they have not performed any security or stabilization activities.

**Mixed-Use Site**

As you are aware, the mixed-use building became more complicated after Walmart's decision not to build its store. The underlying rental assumptions, both for the apartment and retail components, required critical adjustments which affected the HUD loan proceeds. The project delay has increased the total development costs, even after three

CGM0000274



# A&R Development

rounds of value engineering. These factors have increased the funding shortfall which is currently $19.3 million.

Concurrent with our efforts to validate the Walmart lease, my team has diligently pursued moving the mixed-use building forward. On September 8, 2016, we had a meeting with the Deputy Mayor's Office and representatives from the Office to Planning. The meeting was intended to present potential solutions for the shortfall and to collaborate on ways to address the project funding. We presented a plan comprised of three components:

1. An offer to reduce the Developer's Fee by almost 50% from $11 million to $6 million;
2. A commitment by DCHA to fund an additional $2 million;
3. The possibility of city agencies leasing the retail space for office use.

This approach allows for a 2nd quarter 2017 closing. Other options, such as building redesign, have unknown cost reductions and result in a far longer timeline. Together, the three enhancements above would reduce the shortfall to $9.5 million. To cover this gap, we requested that DMPED increase the city's funding by this amount, bringing their total commitment to the project to $22.5 million ($72,115/unit).

DMPED committed to reviewing the request and responding by the end of September; however, the proposal that the city fund the remaining $9.5 million shortfall did not appear to be well-received. We were given the feedback that a redesign of the building should be pursued by the development team in an effort to reduce the gap further, but no target number was provided for what gap would be supportable by the city. Given the absence of a target funding amount from the city and the amount of money we have already advanced to pursue this project, we do not have the appetite to spend more without a clear path to closing.

As you know, A&R has funded 100% of the $1.9 million spent to date on pre-development of the mixed-used building. In addition to our out-of-pocket costs, we have put significant staff time and overhead cost into the development of this building, and more recently, into trying to solve for the funding shortfall in a way that would allow for the quickest time to market for this affordable housing project at a gateway to the District.

Based on the response of the DMPED staff in the September 8th meeting, we plan to "mothball" this project and will not expend additional resources in development activities without further contribution from the city. We will, however, prepare the site for long-term inactivity. By month's end we will have commenced the erection of a quality security fence for our tract and will be monitoring the site for security and maintenance concerns.

2

CGM0000275


A&R DEVELOPMENT

We believe that a partners' meeting is in order to discuss our intentions for both parcels.  I will be in contact with your office to schedule a mutually convenient time.

Sincerely yours,

Marjorie Rodgers Cheshire
President & Chief Operating Officer


cc:     Theo Rodgers, A&R Development
        Feras Qumseya, A&R Development
        Kimberly King, DCHA

3

CGM0000276

**Exhibit 2**

Filed
D.C. Superior Court
06/16/2022 11:18AM
Clerk of the Court

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

**DISTRICT OF COLUMBIA,**                            :
1350 Pennsylvania Avenue, N.W.
Washington, DC  20004,                               :
a municipal corporation
                                                     :

        **Plaintiff,**                               :

    v.                                               :    Civil Action No. <u>2022 CA 2424</u> E(RP)

                                                     :
**ALL OF THE PARCEL OF LAND
IDENTIFIED AS SQUARE 5246, LOT 110,**                :
**LOCATED IN THE 5700 BLOCK OF
EAST CAPITOL STREET, NE**                            :
**IN THE DISTRICT OF COLUMBIA**
                                                     :
**AND**
                                                     :

**ALL OF THE PARCEL OF LAND
IDENTIFIED AS SQUARE 5273, LOTS 807,**               :
**808, 809, AND 7000 – 7014, LOCATED IN**
**THE 5800 BLOCK OF EAST CAPITOL**                   :
**STREET, NE IN THE DISTRICT**
**OF COLUMBIA**                                      :

**AND**                                              :

**DISTRICT OF COLUMBIA**                             :
**HOUSING AUTHORITY**
**1133 NORTH CAPITOL STREET, NE**                    :
**WASHINGTON, DC 20002**
                                                     :
**AND**
                                                     :
**CG MARKETPLACE, LLC**
**1040 PARK AVENUE**                                 :
**SUITE 300**
**BALTIMORE, MD 21201**                              :

        **SERVE:**                                   :
        **BUSINESS FILINGS INC. OF**
        **DELAWARE**                                 :
        **1015 15TH ST., NW, SUITE 1000**
        **WASHINGTON, DC 20005**                     :

**AND**                                              :

PNC BANK, N.A.                          :
222 DELAWARE AVENUE
WILMINGTON, DE 19801                    :

AND                                     :

BRIAN J. CANNON                         :
4306 FARMFIELD COURT
BALDWIN, MARYLAND 21013                 :

AND                                     :

PATRICK G. TEHAN                        :
2010 HOLLY RIDGE COURT
LUTHERVILLE, MARYLAND 21093             :

          **Defendants.**      :

## <u>DECLARATION OF TAKING</u>

The District of Columbia, pursuant to D.C. Official Code §§ 16-1311 and 16-1314 and

D.C. Act 24-411, hereby declares that:

1.      The real property located in the 5700 block of East Capitol Street, NE, in the

District of Columbia, on a parcel designated in the land records of the District of Columbia as

Square 5246, Lot 110, and the real property located in the 5800 block of East Capitol Street, NE,

on parcels designated in the land records of the District of Columbia as Square 5273, Lots 807,

808, 809, and 7000 through 7014, and more specifically described on <u>Exhibit A</u> attached hereto

(the "Property") is hereby taken for the use of, and in the name of, the District of Columbia.

2.      The public purposes for which the District hereby takes the fee simple interest in the

Property include reducing food insecurity in an underserved neighborhood and providing

revitalization in an economically distressed community. The District takes the Property for the

additional public purposes of the removal of unsafe and unsanitary conditions, reduction of the

incidence of crime, and the removal of garbage and other eyesores.

2

3.     A plan showing the Property and its location in the District of Columbia,

sufficient for the identification thereof, is attached hereto as Exhibit B.

4.     The District of Columbia is taking this Property pursuant to its authority under

D.C. Official Code § 16-1311 and D.C. Act 24-411.

5.     The estate hereby taken in the Property for the above-stated purposes is an estate

in fee simple absolute, including without limitation any and all rights, claims or interests in, to or

under the Property.

6.     The sum of money estimated to be just compensation for the Property, including

all the interests therein, is $14,470,000.00; said sum is deposited herewith into the Registry of

this Court for the payment of compensation to the persons entitled thereto.

Date: May 24, 2022 _____

Deputy Mayor for Planning and
Economic Development
[Pursuant to Mayor's Order 2022-071]

A TRUE COPY
TEST: 8/24/2022

Clerk, Superior Court of
the District of Columbia

By _____

Deputy Clerk

3

EXHIBIT A

(Legal Description of Property)

Lot 110 in Square 5246 in the subdivision made by East Capitol Family Rental Limited Partnership, as per plat recorded in Liber No. 201 at folio 10 of the Records of the Office of the Surveyor for the District of Columbia.

AND

Lot 68 in Square 5273 in the subdivision made by the District of Columbia Housing Authority, as per plat recorded in Liber No. 208 at folio 92 of the Records of the Office of the Surveyor for the District of Columbia.

NOTE: At the date hereof the above described land is designated on the Records of the Assessor of the District of Columbia for assessment and taxation purposes as Lots 807, 808, 809 and 7000 through 7014 in Square 5273.

<u>EXHIBIT B</u>

(Plan of Property)



TAX MAP

**Exhibit 3**

Filed
D.C. Superior Court
08/15/2022 18:04PM
Clerk of the Court

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | |
|---|---|
| DISTRICT OF COLUMBIA | |
| Plaintiff, | |
| v. | Case No.: 2022 CA 002424 E(RP) |
| ALL OF THE PARCEL OF LAND IDENTIFIED AS SQUARE 5246, LOT 110, LOCATED IN THE 5700 BLOCK OF EAST CAPITOL STREET, NE IN THE DISTRICT OF COLUMBIA, *et al.* | Hon. Maurice Ross  Next Event: Initial Scheduling Conference  September 2, 2022, at 9:30am |
| Defendants. | |

**BRIEF IN OPPOSITION TO THE DISTRICT OF COLUMBIA'S MOTION TO STRIKE CG MARKETPLACE, LLC'S AMENDED ANSWER AND CROSSCLAIM**

The District of Columbia ("District") moves to strike the Answer filed by CG Marketplace, LLC ("CGM"), arguing that the Answer contains insufficiently detailed "defenses" and "objections" to the taking. In support, the District relies exclusively on inapposite cases addressing not answers in condemnation cases, but something entirely different: the viability of affirmative defenses in condemnation cases. But CGM asserts ***no*** affirmative defenses in its Answer, let alone any other "defense" or "objection" to the taking. Candidly, the District's motion simply conflates the heightened pleading requirements applicable to affirmative defenses with Rule 8(b)'s regulation of how a party must respond to allegations in a complaint.

Indeed, the District's Motion concerns only three denials in CGM's Answer—in Paragraphs 3, 4, and 5. But the denials in Paragraphs 3 and 4 relate to insufficient knowledge and legal conclusions. Hardly a defense or objection, let alone an affirmative defense. And the denial in Paragraph 5 concerns the District's failure to negotiate with CGM before filing this action. Again, neither a defense, objection, nor affirmative defense. The District does not—because it cannot—cite to any authority compelling a defendant to admit inaccurate facts. Rather, it cites to

Rule 71.1, which concerns how "defenses" and "objections" to a taking must be presented in condemnation cases. But Rule 71.1 does not prohibit answers *without* "defenses" or "objections," or answers that simply respond to the allegations in a complaint. Its failure to do so mandates that Rule 8(b) applies, and Rule 8(b) compels CGM to deny the District's inaccurate allegations.

The District also moves to strike CGM's Crossclaims against the District of Columbia Housing Authority ("DCHA"), arguing that the Crossclaims are barred by Rule 71.1. But Rule 71.1 says nothing about crossclaims, let alone bars them. As before, its silence mandates that Rule 13 applies, and Rule 13 explicitly permits crossclaims.

## BACKGROUND

This case is about the District, on the one hand, partnering with CGM and inducing it to spend millions of dollars to develop the property at issue and then, on the other hand, using its power of eminent domain to take CGM's property interest without any compensation, depriving CGM of its constitutional, statutory, and contractual right to just compensation. Indeed, more than a decade ago the District and its affiliate, the DCHA, went into business with CGM to develop an underutilized portion of land. To that end, CGM (as lessee) entered into a 99-year ground lease with DCHA (as lessor) and proceeded to invest years of work and millions of dollars in developing the property. Then, politics changed. And now the District seeks to condemn the property, while its affiliate DCHA argues that it is entitled to *all* of the just compensation—leaving CGM with nothing but the loan it secured to develop the property.

This saga began in November 2011, when CGM was formed by A&R/THC Marketplace, LLC (a private company) and DC Housing Commercial, LLC (an affiliate of the DCHA and, thus, of the District). Each member had, and still has, an equal interest in CGM. CGM's purpose was to "develop, own, and . . . manage . . . a mixed-use project . . . to be known as [the] Capitol Gateway

Marketplace" in the District. At all times, CGM has been managed by the A&R Development Corp. (the Manager of A&R/THC Marketplace).

In May 2012, to further its defined purpose, CGM leased nearly 12 acres of property—comprising all the land subject to this condemnation action (the "Property")—from the DCHA ("Ground Lease"). The Ground Lease ran for a 99-year term and—as any profits from the development would ultimately be split with the DCHA's affiliate pursuant to the terms of the Operating Agreement—required CGM to pay only nominal rent.

At the same time, CGM sublet a portion of the Property to Walmart to build a retail store on the site ("Walmart Sublease"). The Walmart Sublease ran for an initial 20-year term, during which Walmart was obligated to pay annual rent of $1,300,000 to CGM. Walmart began making those rent payments in July 2017.

To support the planned Walmart retail store and surrounding development, CGM spent millions of dollars improving the Property. Financing for these improvements was obtained from PNC Bank and a contribution from Walmart. The development loan was secured by CGM's leasehold interest and improvements on the Property, was financed through the Walmart rent payments, and was guaranteed by the A&R Development Corp. and Theo C. Rodgers personally (A&R Development Corp.'s Chief Executive Officer).

After years of work, the political winds shifted, and the District, despite the numerous interlocking contractual obligations, began crafting a way to cut CGM out of the development, take the Property, and pay all of the just compensation to its affiliate DCHA. To that end, the District, with full knowledge that it would soon condemn the Property and thereby terminate its obligations under the Walmart Sublease, struck a deal with Walmart in December 2021 whereby Walmart assigned the Sublease to the District and paid the District $6,685,000. In other words, in

exchange for $6,685,000, the District was now obligated to pay CGM $1,300,000 per year—but only until it condemned the Property and terminated the Walmart Sublease. The value of the remaining lease payments through mid-2037 was approximately $20 million.

In February 2022, the District then turned around and offered the DCHA—as noted above, its own affiliate—$20,000,000 for "the fee simple title to the Property, free and clear of all liens and encumbrances (including any leasehold interest)[.]" Motion, Ex. 1. Despite this apparent interest in obtaining clear title, the District made absolutely *no* effort to negotiate with CGM regarding the purchase of its 99-year leasehold interest in the Property. Instead, the District filed this condemnation action on May 31, 2022. The District then filed its Declaration of Taking on June 16, 2022, effectively taking title to the Property, purporting to terminate CGM's 99-year ground lease, and terminating the Walmart Sublease (and with it the District's obligation to pay $1.3 million per year to CGM). In other words, by assuming the Walmart Sublease, the District will have paid approximately $380,000 in rent to CGM, but was paid $6,685,000 by Walmart, resulting in a net gain to the District of approximately $6,300,000.

Then, after the District condemned the Property—and wiped out CGM's multi-million dollar income stream without offering CGM a penny—the District's affiliate, the DCHA, took the position under the Ground Lease that it was entitled to any and all compensation paid by the District for the Property.[1] So the purported effect of the District's condemnation was to eliminate

---

[1] Under CGM's reading of the Ground Lease, the DCHA's affiliate would be entitled to 50% of the compensation paid for CGM's 99-year leasehold and the DCHA would be entitled to 100% of the reversionary fee simple interest. Apparently not satisfied with that arrangement, the DCHA has put forward a tortured reading of the Ground Lease under which the DCHA would receive 100% of the compensation paid for any and all interests in the Property. CGM has filed the Crossclaim to address this very issue.

CGM's income stream from the Walmart Sublease and CGM's 99-year ground lease in the Property, and leave CGM with nothing, paying all of the money to its affiliate DCHA.

But there are two fundamental legal problems with the District's scheme. First, under D.C.'s condemnation statute, black-letter condemnation law, and the plain terms of the Ground Lease, CGM is entitled to be ***fully and independently*** compensated for the taking of its leasehold interest. This is known as the "aggregate of interests" valuation method, under which CGM is entitled to independently present evidence on, and receive compensation equaling, the full value of its leasehold interest. CGM estimates the value of its leasehold interest to be more than double the $14 million the District has paid into the Court. Under the Operating Agreement, the DCHA's affiliate may be entitled to up to half of that compensation. And as fee simple owner of the Property, the DCHA is entitled to compensation for the taking of its de minimis remainder interest. But there is no question that, under D.C. law, CGM is entitled to have its leasehold interest separately valued and compensated.

Second, the DCHA's position that it is entitled to ***all*** of the just compensation paid by the District is fundamentally wrong and contrary to the terms of the Ground Lease. Indeed, the DCHA goes so far as to suggest that none of the condemnation proceeds may be used by CGM to pay off the PNC loan, and that CGM's principal Theo Rodgers is personally responsible for the debt. And that is why CGM elected to amend its Answer and include Crossclaims against the DCHA to contest the DCHA's reading of the Ground Lease and ensure CGM obtains constitutionally, statutorily, and contractually mandated compensation for its leasehold interest. The District's Motion followed.

**ARGUMENT**

<u>CGM's Answer is Permitted by, and Conforms to, Rule 8(b)</u>

The District decided to file this Motion—and consume this Court's and the parties' resources—because it believes that CGM's Answer is "insufficiently pleaded, legally insufficient, and not permitted under the [Rules] and binding . . . case law." Motion at 1-2. But the Motion rests on a faulty premise. The District simply conflates the heightened pleading requirements applicable to affirmative defenses with the Rule regulating how a party responds to allegations in a complaint. A cursory examination of CGM's Answer shows that it ***contains no affirmative defenses***, and instead merely admits and denies various allegations in the District's Complaint. The bulk of the District's motion, therefore, is immaterial and irrelevant.

The District tacitly recognizes this reality. So it suggests that answers in condemnation cases are prohibited unless they contain well-pled objections or defenses to the taking. But the District's reading of the text is erroneous. Rule 71.1(e) states that a defendant with an objection or defense "must" file an answer. It also states that a defendant with no objection or defense to the taking "may" elect to file only a notice of appearance. But Rule 71.1(e) does ***not*** state that a defendant with no objection or defense must file a notice of appearance and cannot file an answer.

Tellingly, the District cites ***no*** binding authority to the contrary. It cites *Duk Hea Oh v. Nat'l Cap. Revitalization Corp.*, 7 A.3d 997 (D.C. 2010), and *Franco v. Nat'l Cap. Revitalization Corp.*, 930 A.2d 160 (D.C. 2007), but both those cases explicitly involved affirmative defenses— in those cases, that the stated purpose for the taking was pretextual—and both opinions only struck the affirmative defenses. It cites a trio of cases from the Superior Court (including one presided over by this Honorable Court), but again, those cases all explicitly involved affirmative defenses identified as such. *See, e.g.*, *District of Columbia v. 2805 4th St., LLC et al.*, 2016 CA 5379 E(RP)

6

(Dec. 22, 2016) (Judge Maurice Ross) (order striking "all of Defendant's **affirmative defenses** as pled and set forth in its Answer" (emphasis added)). And it quotes Wright & Miller for the proposition that "[t]he only function of the answer [in a case proceeding under the federal counterpart to Rule 71.1] is to contest the right of the government to take land[.]" But to opine that an answer has only one "function" is not to say that an answer that does not serve that function is prohibited.

Rule 71.1's silence on this issue means that CGM must follow Rule 8(b). *See* Rule 71.1(a) (applying all Rules to condemnation proceedings "except as [Rule 71.1] provides otherwise"). And Rule 8(b), in turn, requires CGM to "admit or deny the allegations asserted against it." The District attempts to turn those admissions and denials into affirmative defenses—which it presumably then hopes to have stricken for being insufficiently pleaded. For example, the District spills copious ink arguing that its stated public purpose was "valid." Motion at 8-11. But the District never alleged that that purpose was valid—and thus CGM never denied that it was so. The District merely alleged various "public purposes for which" the property was taken. Compl. ¶ 4. CGM is not privy to the District's thoughts and motives, so—as required under Rule 8(b)(5)—it denied those allegations for a lack of "sufficient information or knowledge[.]" Answer ¶ 4. The District did allege—and now vigorously argues—that it had legal "authority for the taking[.]" Compl. ¶ 3. But as identified in CGM's Answer, this is a legal conclusion, Answer ¶ 4, and even an *admission* of this "allegation" would have been without legal effect since this court is "not bound by stipulations on question of law[.]" *District of Columbia v. Coleman*, 667 A.2d 811, 820 n.14 (D.C. 1995) (citation omitted).[2]

---

[2] Note, too, that whether a taking is for a public purpose is also a question of law to which an admission by CGM would have been without legal effect. *See Jasper v. Sawyer*, 100 F. Supp. 421, 423 (D.D.C. 1951).

<u>The District Did Not Attempt to Negotiate</u>
<u>with CGM So CGM's Denial Was Appropriate</u>

The District also asks this Court to strike CGM's denial regarding alleged negotiations with CGM. But CGM properly—and accurately—denied any inference that the District negotiated with CGM regarding the purchase of CGM's leasehold interest.

The Complaint alleges that "agents . . . authorized to negotiate for the purchase of the Property . . . have been unable to acquire the Property at a price satisfactory to the District." Compl. ¶ 5. CGM's Answer "denie[d] . . . that [such] agents . . . have negotiated with CG Marketplace[.]" Answer ¶ 5. The District's motion recasts this denial as an argument that "the District failed to fully comply with D.C. Code § 16–1311"; emphasizes that such failure "is not an objection or defense to the taking"; and takes great pains to show that the District negotiated with ***the DCHA***. Motion at 11–12. These arguments are all straw men. As explained above, CGM, having chosen to file an answer, was required to admit or deny each allegation in the District's Complaint. To the extent the District's allegations regarding negotiations suggested that it had negotiated with CGM, CGM determined that it was necessary to set the record straight.

While attacking its self-fabricated arguments, the District suggests that the CGM interfered with the negotiations between the District and the DCHA. Specifically, the District queries whether CGM has "prevent[ed the] DCHA from being able to deliver free and clear title." Motion at 11. But CGM has no obligation to facilitate negotiations between the District and any other interest holder in the property. To the contrary, the District has a statutory obligation to fully and independently compensate CGM for its leasehold interest. After all, the relevant statutory provision explicitly permits CGM to present evidence of the value of its leasehold interest to the jury, and requires the jury to independently value that leasehold interest. D.C. Code § 16–1317 ("[T]he jury . . . shall proceed . . . to hear and receive any evidence offered or submitted . . . by

8

*any* person having an interest in the proceeding . . . . [and then] shall return to the court . . . their appraisement of the value of the interests of *all* persons, *respectively*, in the real property[.]" (emphasis added)).

Furthermore, the language of this provision requires application of the aggregate of interests approach, under which CGM is entitled to the full value of its leasehold interest, not simply some portion of the award ultimately paid to DCHA.[3] *See Utah Dep't of Transp. v. FPA W. Point, LLC*, 304 P.3d 810, 814-15 (Utah 2012) (statute required the jury to "determine and assess . . . the value each and every separate estate or interest in the property"; court held that this language required use of the "aggregate of interests" approach); *see also* Tony Sevelka, *Compensation for Leasehold Takings and Apportionment of Awards*, THE APPRAISAL JOURNAL, Fall 2018, at 280 n.4 (noting that "the District of Columbia use[s] the 'aggregate of interest rule[,] . . . [which] values each individual property interest holder's interest, and then adds the value of each interest to determine the value of the whole property").

---

[3] Many jurisdictions follow a different approach, known as the "unit rule," in condemnation cases. The District of Columbia used to follow this approach. *See Carlock v. United States*, 53 F.2d 926, 927 (D.C. Cir. 1931) ("[T]he rule is to ascertain the entire compensation to be allowed as though the entire title or estate in the property belong to one person, and then apportion the sum between the holders of the different interests, according to their respective rights."). But the statute in effect when *Carlock* was decided directed the jury to value the property in fee simple *only*, 45 Stat. 1416 § 15 ("The verdict . . . shall set forth, *parcel by parcel*, the compensation to be paid for the taking of the *lands* to be condemned." (emphasis added)), and established a separate proceeding, conducted by the judge, to divide that just compensation award amongst the interest holders, *id.* § 21 ("The court, upon the application of . . . any party in interest, shall have power to determine and direct who is entitled to receive payment of the money . . . and may . . . order a reference to the auditor of the court or a special master to ascertain the facts on which such determination and direction are to be made."). That statute was repealed in 1963 and replaced with D.C. Code § 16–1310 *et seq.*—i.e., the current statute statutory framework governing takings in D.C. *See* Pub. L. 88-241 § 21(b). As noted above, the new statute's language requires application of the aggregate of interests approach.

The application of the aggregate of interests approach provides a very plausible explanation for the District's decision to negotiate with every major interest holder in the Property except CGM. The District was presumably happy to receive $6.7 million to assume the Walmart Sublease rental obligations, since it could—and did—simply extinguish those obligations through condemnation. And as the Ground Lease's nominal rent provisions combined with the expected income stream from the Walmart Sublease made CGM's leasehold interest ***extremely valuable***, the District was presumably happy to offer the DCHA $20 million (notably, approximately $6 million more than the $14 million it has deposited into the Court registry) for clear title to the Property, since it would then avoid having to compensate CGM for the full value of that interest.

The success of this plan, however, depends on the ability of the DCHA—a District affiliate—to convince CGM to relinquish its leasehold interest at an acceptable price. That, in turn, provides a plausible explanation for the DCHA's extremely aggressive and inequitable stance vis-à-vis the distribution of the just compensation award, which stance prompted CGM to crossclaim against the DCHA in the first place. It also provides a plausible explanation as to why the District—against whom those Crossclaims are not brought—would seek to have those Crossclaims dismissed.

<u>The Rules Explicitly Allow CGM's Crossclaims Against the DCHA</u>

Perhaps to further this plan, the District argues that CGM's Crossclaims against the DCHA are "not permitted," and moves this Court to strike them.[4] That request should be denied.

---

[4] Notably, the DCHA does ***not*** move to strike the Crossclaims, which are brought against it and only it.

Late in the evening on Saturday, August 13, 2022—i.e., less than 36 hours before the due date for this memorandum—and without prior notice to undersigned counsel, the DCHA filed a "Memorandum in Support" of the District's Motion.

As explained in CGM's concurrently filed Response to this Memorandum, the DCHA's filing should be stricken. The DCHA has waived its right to file its own Motion to Strike by

In the first place, this argument is raised solely and entirely in a footnote. Motion at 2, n.1. So it should not be considered, and the Court should deny the District's motion to strike the crossclaim on that basis alone. *See Marsden v. District of Columbia*, 142 A.3d 525, 526 n.1 (D.C. 2016) (refusing to even consider argument raised solely in footnote).

In any event, the argument is meritless. The District argues that Rule 71.1 "provides that only an answer presenting defenses or objections to the taking is permitted." Motion at 2, n.1. The District misreads the Rule. The District is correct that Rule 71.1(e)(2) requires a defendant to present all objections and defenses "***to the taking***" in an answer, and that Rule 71.1(e)(3) forbids "pleading[s] or motion[s] asserting . . . ***additional*** objection[s] or defense[s]" to the taking that are not presented in that answer. But Rule 71.1 is entirely silent as to crossclaims—which, by definition, cannot involve objections or defenses to a plaintiff's taking of a defendant's property. *See* Rule 13(g) (a crossclaim is a "claim by one party against a ***coparty***" (emphasis added)).

More importantly, Rule 71.1(a) preserves the applicability of all other, non-conflicting Rules. *See United States v. Merchants Matrix Cut Syndicate*, 219 F.2d 90, 95 (7th Cir. 1955) ("except as otherwise provided" in Fed. R. Civ. P. 71.1, all other rules are to be "giv[en] full

---

answering the Crossclaims. *See* Rule 12(f)(2) (noting that a motion to strike must be filed "before responding to the pleading"); *see also Augustus v. Harvey*, 2005 WL 8159425, at *3 (D.D.C. Sept. 29, 2005) ("Because plaintiff's motion to strike . . . is untimely . . . it will be denied."). And it cites no authority supporting its ability to file a memorandum in support of *another* party's motion.

But even if this Court were inclined to consider the Memorandum, it raises no new arguments. At most, it cites a distinguishable and thus unhelpful case, *Franco v. NCRC*, 930 A.2d 160 (D.C. 2007). In *Franco*, the Superior Court struck *counterclaims* as impermissible under the then-applicable version of Rule 71.1. *Id.* at 170. But the defendant "*d[id] not contest th[at] decision*" on appeal. *Id.* (emphasis added). So the Court of Appeals had no occasion to—and thus did not—pass on the propriety of that ruling. Further, the counterclaims were in the nature of "objection[s] or defense[s] to the taking" under Rule 71.1(e), *see id.* ("Taking in Violation of the Takings Clause Public Use Provisions"), and therefore stand in stark contrast to CGM's Crossclaims, which relate solely to a contract-interpretation dispute between CGM and the DCHA.

play").[5] Based on Rule 71.1's silence regarding crossclaims, this necessarily includes Rule 13(g), which explicitly permits crossclaims between defendants. *See Merchants Matrix Cut Syndicate*, 219 F.2d at 96 ("Only by inserting a judicial rubric in Rule 71[.1] could we interpret it as containing some lurking prohibition against invoking Rule 13."). And the District makes no attempt to dispute the satisfaction of Rule 13(g)'s other requirements—e.g., that crossclaims must "arise[] out of the transaction or occurrence that is the subject matter of the original action or of a counterclaim, or if the claim relates to any property that is the subject matter of the original action."

## CONCLUSION

For those reasons, the District's motion to strike CGM's Answer and Crossclaims should be denied.

Respectfully submitted,

August 15, 2022

/s/ Edward S. Scheideman
Edward S. Scheideman (D.C. Bar No. 475128)
DLA PIPER LLP (US)
500 8th Street NW
Washington, DC 20004
T: (202) 799-4534
F: (202) 799-5534

Brett Ingerman
DLA PIPER LLP (US)
6225 Smith Avenue
Baltimore, MD 21209
T: (410) 580-4177
F: (410) 580-3177
brett.ingerman@us.dlapiper.com

---

[5] The District concedes that authority interpreting the Federal Rules is "persuasive authority regarding [a] local Rule's application." Motion at 4 n.3.

## CERTIFICATE OF SERVICE

I certify that, on August 15, 2022, I caused the foregoing to be served by CaseFileExpress on the following:

William D. Burk
Andrew A. Glover

*Counsel for the District of Columbia*

David E. Hawkins

*Counsel for the District of Columbia Housing Authority*

and to be served by first-class mail, postage prepaid, on:

PNC BANK, N.A.
222 Delaware Avenue
Wilmington, DE 19801

BRIAN J. CANNON
4306 Farmfield Court
Baldwin, MD 21013

PATRICK G. TEHAN
2010 Holly Ridge Court
Lutherville, MD 21093

/s/ Edward S. Scheideman
Edward S. Scheideman